**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
CASE NO.

AUDEMARS PIGUET HOLDING SA,
CHANEL, INC., GUCCI AMERICA, INC.,
HUBLOT SA, COMPAGNIE DES
MONTRES LONGINES, FRANCILLON S.A.,
OMEGA SA, RADO UHREN AG, and
TURLEN HOLDING SA

            Plaintiffs,

vs.

THE INDIVIDUALS, PARTNERSHIPS and
UNINCORPORATED ASSOCIATIONS
IDENTIFIED ON SCHEDULE "A,"

            Defendants.

_____/

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiffs, Audemars Piguet Holding SA, Chanel, Inc., Gucci America, Inc., Hublot SA,

Compagnie des Montres Longines, Francillon S.A., Omega SA, Rado Uhren AG, and Turlen

Holding SA (collectively "Plaintiffs")[1], hereby sue Defendants, the Individuals, Partnerships and

Unincorporated Associations identified on Schedule "A" hereto (collectively "Defendants").

Defendants are promoting, selling, offering for sale and distributing goods bearing counterfeits

_____

[1] Each Plaintiff is a member of the Federation of the Swiss Watch Industry FH, a non-profit trade association with nearly 500 members, representing more than 90% of all Swiss watch manufacturers, which was founded in 1924 to contribute to the protection and development of the Swiss Watch Industry. In 1999, members of the Federation of the Swiss Watch Industry FH, including Plaintiffs, established the Anti-Counterfeiting Group, which was created to combat common sources of counterfeit goods which cause harm to its members' respective brands individually and to the Swiss watch industry in its entirety, which results in further harm to each member's brand. Since 1999, the Federation of the Swiss Watch Industry FH, through its anti-counterfeiting division, has worked with international law enforcement and government agencies to conduct raids and investigations of counterfeit operations, as well as raise public awareness regarding the issue.

and confusingly similar imitations of Plaintiffs' respective trademarks within this district through the commercial Internet website and various Internet based e-commerce stores operating under their domain name or the seller identities, store urls, and store numbers set forth on Schedule "A" hereto (the "Subject Domain Name and Seller IDs"). In support of their claims, Plaintiffs allege as follows:

<u>**JURISDICTION AND VENUE**</u>

1.      This is an action for federal trademark counterfeiting and infringement, false designation of origin, common law unfair competition, and common law trademark infringement, pursuant to 15 U.S.C. §§ 1114, 1116, and 1125(a), The All Writs Act, 28 U.S.C. § 1651(a), and Florida's common law. Accordingly, this Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' state law claims because those  claims are so related to the federal claims that they form part of the same case or controversy.

2.      Defendants are subject to personal jurisdiction in this district because they direct business activities toward and conduct business with consumers throughout the United States, including within the State of Florida and this district through at least the commercial Internet website and Internet based e-commerce stores accessible in Florida and operating under their Subject Domain Name and Seller IDs.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 since Defendants are, upon information and belief, aliens who engaged in infringing activities and caused harm within this district. Defendants have also advertised, offered for sale, made sales and shipped infringing products into this district.

## THE PLAINTIFFS

4.      Plaintiff Audemars Piguet Holding SA (Audemars Piguet) is a societe anonyme organized under the laws of Switzerland, having its principal office in Le Brassus, Switzerland.

5.      Plaintiff Chanel, Inc. ("Chanel") is a corporation organized under the laws of the State of New York with its principal place of business in the United States located at Nine West 57th Street, New York, New York 10019.

6.      Plaintiff Gucci America, Inc. ("Gucci") is a corporation organized and existing under the laws of the State of New York with its principal place of business in the United States located at 21 East 63rd Street, New York, New York 10021.

7.      Plaintiff Hublot SA ("Hublot") is a societe anonyme organized under the laws of Switzerland with a principal place of business in Nyon, Switzerland.

8.      Plaintiff Compagnie des Montres Longines, Francillon S.A. ("Longines") is a corporation organized and existing under the laws of Switzerland with its principal place of business located in Saint-Imier, Switzerland.

9.      Plaintiff Omega SA ("Omega") is a societe anonyme organized under the laws of Switzerland with its principal place of business located in Bienne, Switzerland.

10.      Plaintiff Rado Uhren AG ("Rado") is a corporation organized and existing under the laws of Switzerland with its principal place of business located in Lengnau, Switzerland.

11.      Plaintiff Turlen Holding SA ("Turlen") is a societe anonyme organized under the laws of Switzerland with its principal place of business located in Les Breuleux, Switzerland.

12.      Plaintiffs' trademarked goods are sold within the State of Florida, including this district, through their boutiques and at high quality and prestigious retailers which are carefully selected and satisfy certain criteria. Defendants, through the sale and offer to sell counterfeit and

infringing versions of Plaintiffs' respective branded products, are directly, and unfairly, competing with each Plaintiffs' economic interests in the State of Florida and causing each Plaintiff harm within this jurisdiction.

13.     Like many other famous trademark owners, Plaintiffs suffer ongoing daily and sustained violations of their respective trademark rights at the hands of counterfeiters and infringers, such as Defendants herein, who wrongfully reproduce and counterfeit Plaintiffs' individual trademarks for the twin purposes of (i) duping and confusing the consuming public and (ii) earning substantial profits. The natural and intended byproduct of Defendants' actions is the erosion and destruction of the goodwill associated with Plaintiffs' respective famous names and trademarks, as well as the destruction of the legitimate swiss watch market sector in which they operate.

14.     In order to combat the indivisible harm caused by the combined actions of Defendants and others engaging in similar conduct, each year Plaintiffs expend significant monetary resources in connection with trademark enforcement efforts, including legal fees, investigative fees, and support mechanisms for law enforcement such as field training guides and seminars. The recent explosion of counterfeiting over the Internet, particularly through online marketplace platforms, has created an environment which requires companies, such as Plaintiffs, to expend significant time and money across a wide spectrum of efforts in order to protect both consumers and themselves from the ill effects of confusion and the erosion of the goodwill connected to Plaintiffs' respective brands.

## **THE DEFENDANTS**

15.     Defendants are individuals and/or business entities of unknown makeup, each of whom, upon information and belief, either reside or operate in foreign jurisdictions, or

4

redistribute products from the same or similar sources in those locations. Defendants have the capacity to be sued pursuant to Federal Rule of Civil Procedure 17(b). Defendants target their business activities towards consumers throughout the United States, including within this district, and conduct pervasive business through the operation of, at least, the commercial Internet website and Internet based marketplace websites, AliEpress.com, eBay.com, iOffer.com, and Wish.com, via the e-commerce stores existing under the Subject Domain Name and Seller IDs.

16.     Defendants are the past and present controlling forces behind the sale of products bearing counterfeits and infringements of Plaintiffs' individual trademarks as described herein using at least the Subject Domain Name and Seller IDs.

17.     Upon information and belief, Defendants directly engage in unfair competition with Plaintiffs by advertising, offering for sale, and selling goods bearing counterfeits and infringements of one or more of Plaintiffs' individual trademarks to consumers within the United States and this district through Internet based e-commerce stores using, at least, the Subject Domain Name and Seller IDs and additional domains names or seller identification aliases not yet known to Plaintiffs. Defendants have purposefully directed some portion of their illegal activities towards consumers in the State of Florida through the advertisement, offer to sell, sale, and/or shipment of counterfeit and infringing branded goods into the State.

18.     Defendants have registered, established or purchased, and maintained the Subject Domain Name and Seller IDs.  Upon information and belief, Defendants have engaged in fraudulent conduct with respect to the registration of the Subject Domain Name and Seller IDs and have maintained the Subject Domain Name and Seller IDs for the purpose of engaging in illegal counterfeiting activities.

19.     Upon information and belief, Defendants will continue to register or acquire new domain names and seller identification aliases for the purpose of selling and offering for sale goods bearing counterfeit and confusingly similar imitations of one or more of Plaintiffs' trademarks unless preliminarily and permanently enjoined.

20.     Defendants' Internet-based businesses amount to nothing more than illegal operations established and operated in order to infringe the intellectual property rights of Plaintiffs and others.

21.     Defendants' business names, i.e., the Subject Domain Name and Seller IDs, associated payment accounts, and any other alias domain names, seller identification names, store numbers, or store urls used in connection with the sale of counterfeit and infringing goods bearing one or more of Plaintiffs' trademarks are essential components of Defendants' online activities and are one of the primary means by which Defendants further their counterfeiting and infringement scheme and cause harm to Plaintiffs.  Moreover, Defendants are using Plaintiffs' respective famous names and/or trademarks to drive Internet consumer traffic to their website and e-commerce stores operating under the Subject Domain Name and Seller IDs, thereby increasing the value of the Subject Domain Name and Seller IDs and decreasing the size and value of Plaintiffs' legitimate consumer marketplace at Plaintiffs' expense.

## COMMON FACTUAL ALLEGATIONS

### Audemars Piguet's Trademark Rights

22.     Audemars Piguet is the owner of all rights in and to the trademark identified on Schedule "B" hereto (the "Audemars Piguet Mark"), which is valid and registered on the Principal Register of the United States Patent and Trademark Office. The Audemars Piguet Mark is used in conjunction with the manufacture and distribution of, among other things, high quality

watches. A true and correct copy of the Certificate of Registration for the Audemars Piguet Mark is attached hereto as Exhibit "1."

23.     The Audemars Piguet Mark has been used in interstate commerce to identify and distinguish Audemars Piguet high quality watches and related goods for an extended period of time and serves as a symbol of Audemars Piguet's quality, reputation and goodwill.

24.     Further, Audemars Piguet and related companies have expended substantial time, money and other resources developing, advertising and otherwise promoting the Audemars Piguet Mark. Audemars Piguet and related companies have spent millions of dollars to extensively advertise and promote products under the Audemars Piguet Mark in magazines, newspapers, on the Internet and in other media worldwide, including the official Audemars Piguet website, www.audemarspiguet.com. The Audemars Piguet Mark qualifies as a famous mark as that term is used in 15 U.S.C. §1125(c)(1).

25.     Audemars Piguet and related companies have extensively used, advertised and promoted the Audemars Piguet Mark in the United States in connection with the sale of high quality watches and related goods. As a result of these efforts, the Audemars Piguet Mark is among the most widely recognized trademarks in the United States, and the trademark has achieved secondary meaning as an identifier of high quality goods.

26.     Audemars Piguet has carefully monitored and policed the use of the Audemars Piguet Mark and has never assigned or licensed the Audemars Piguet Mark to any of the Defendants in this matter.

27.     Genuine goods bearing the Audemars Piguet Mark are widely legitimately advertised and promoted by Audemars Piguet and related companies, authorized distributors, and unrelated third parties via the Internet.  Over the course of the past ten years, visibility on the

Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to Audemars Piguet's overall marketing and consumer education efforts. Thus, Audemars Piguet and related companies expend significant monetary resources on Internet marketing and consumer education, including search engine optimization ("SEO") strategies. Those strategies allow Audemars Piguet and its authorized retailers to fairly and legitimately educate consumers about the value associated with the Audemars Piguet Mark and the goods sold thereunder.

### Chanel's Trademark Rights

28.     Chanel is the owner of all rights in and to the trademarks identified on Schedule "C" hereto (the "Chanel Marks"), which are valid and registered on the Principal Register of the United States Patent and Trademark Office. The Chanel Marks are used in conjunction with the manufacture and distribution, among other things, high quality watches. True and correct copies of the Certificates of Registration for the Chanel Marks are attached hereto as Exhibit "2."

29.     The Chanel Marks have been used in interstate commerce to identify and distinguish Chanel's high quality watches and related goods for an extended period of time and serve as symbols of Chanel's quality, reputation and goodwill.

30.     Further, Chanel has expended substantial time, money and other resources developing, advertising and otherwise promoting the Chanel Marks. Chanel has spent millions of dollars to extensively advertise and promote products under the Chanel Marks in magazines, newspapers, on the Internet and in other media worldwide, including the official Chanel website, www.chanel.com. The Chanel Marks qualify as famous marks as that term is used in 15 U.S.C. § 1125(c)(1).

31.     Chanel has extensively used, advertised, and promoted the Chanel Marks in the United States in association with the sale of high quality watches and related goods. As a result of these efforts, the Chanel Marks are among the most widely recognized trademarks in the United States, and the trademarks have achieved secondary meaning as an identifier of high quality goods.

32.     Chanel has carefully monitored and policed the use of the Chanel Marks and has never assigned or licensed the Chanel Mark to any of the Defendants in this matter.

33.     Genuine goods bearing the Chanel Marks are widely legitimately advertised and promoted by Chanel, authorized distributors, and unrelated third parties. Over the course of the past ten years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to Chanel's overall marketing and consumer education efforts. Thus, Chanel expends significant monetary resources on Internet marketing and consumer education, including SEO strategies. Those strategies allow Chanel and its authorized retailers to fairly and legitimately educate consumers about the value associated with the Chanel Marks and the goods sold thereunder.

**Gucci's Trademark Rights**

34.     Gucci is the owner of all rights in and to the trademarks identified on Schedule "D" hereto (the "Gucci Marks"), which are valid and registered on the Principal Register of the United States Patent and Trademark Office.  The Gucci Marks are used in connection with the manufacture and distribution of, among other things, high quality watches. True and correct copies of the Certificates of Registration for the Gucci Marks are attached hereto as Exhibit "3."

35.     The Gucci Marks have been used in interstate commerce to identify and distinguish Gucci's high quality watches and related goods for an extended period of time and serve as symbols of Gucci's quality, reputation and goodwill.

36.     Further Gucci has expended substantial time, money and other resources developing, advertising and otherwise promoting the Gucci Marks.  Gucci has spent millions of dollars promoting the Gucci Marks and products bearing the Gucci Marks in magazines, newspapers, on the Internet and in other media worldwide, including the official Gucci website, www.gucci.com. The Gucci Marks qualify as famous marks as that term is used in 15 U.S.C. §1125(c)(1).

37.     Gucci has extensively used, advertised, and promoted the Gucci Marks in the United States in association with the sale of high quality watches and related goods. As a result of these efforts, the Gucci Marks are among the most widely recognized trademarks in the United States, and the trademarks have achieved secondary meaning as an identifier of high quality goods.

38.     Gucci has carefully monitored and policed the use of the Gucci Marks and has never assigned or licensed the Gucci Marks to any of the Defendants in this matter.

39.     Genuine goods bearing the Gucci Marks are widely legitimately advertised and promoted by Gucci, authorized distributors, and unrelated third parties via the Internet.  Over the course of the past ten years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to Gucci's overall marketing and consumer education efforts. Thus, Gucci expends significant monetary resources on Internet marketing and consumer education, including SEO strategies. Those strategies allow

Gucci and its authorized retailers to fairly and legitimately educate consumers about the value associated with the Gucci Marks and the goods sold thereunder.

**Hublot's Trademark Rights**

40.     Hublot is the owner of all rights in and to the trademark identified on Schedule "E" hereto (the "Hublot Mark"), which is valid and registered on the Principal Register of the United States Patent and Trademark Office. The Hublot Mark is used in conjunction with the manufacture and distribution of, among other things, high quality watches. A true and correct copy of the Certificate of Registration for the Hublot Mark is attached hereto as Exhibit "4."

41.     The Hublot Mark has been used in interstate commerce to identify and distinguish Hublot's high quality watches and related goods for an extended period of time and serves as a symbol of Hublot's quality, reputation, and goodwill.

42.     Further, Hublot has expended substantial time, money and other resources developing, advertising and otherwise promoting the Hublot Mark.  Hublot has spent millions of dollars to extensively advertise and promote products under the Hublot Mark in magazines, newspapers, on the Internet and in other media worldwide, including the official Hublot website, www.hublot.com. The Hublot Mark qualifies as a famous mark as that term is used in 15 U.S.C. §1125(c)(1).

43.     Hublot has extensively used, advertised and promoted the Hublot Mark in the United States in connection with the sale of high quality watches and related goods. As a result, the Hublot Mark is among the most widely recognized trademarks in the United States, and the trademark has achieved secondary meaning as an identifier of high quality goods.

44.     Hublot has carefully monitored and policed the use of the Hublot Mark and has never assigned or licensed the Hublot Mark to any of the Defendants in this matter.

45.     Genuine goods bearing the Hublot Mark are widely legitimately advertised and promoted by Hublot, authorized distributors, and unrelated third parties via the Internet.  Over the course of the past ten years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to Hublot's overall marketing and consumer education efforts. Thus, Hublot expends significant monetary resources on Internet marketing and consumer education, including SEO strategies. Those strategies allow Hublot and its authorized retailers to fairly and legitimately educate consumers about the value associated with the Hublot Mark and the goods sold thereunder.

**Longines' Trademark Rights**

46.     Longines is the owner of all rights in and to the trademark identified on Schedule "F" hereto (the "Longines Mark"), which is valid and registered on the Principal Register of the United States Patent and Trademark Office. The Longines Mark is used in conjunction with the manufacture and distribution of, among other things, high quality watches. A true and correct copy of the Certificate of Registration for the Longines Mark is attached hereto as Exhibit "5."

47.     The Longines Mark has been used in interstate commerce to identify and distinguish Longines' high quality watches and related goods for an extended period of time and serves as a symbol of Longines' quality, reputation and goodwill.

48.     Further, Longines has expended substantial time, money and other resources developing, advertising and otherwise promoting the Longines Mark.  Longines and related companies have spent millions of dollars to extensively advertise and promote products under the Longines Mark in magazines, newspapers, in stores, on the Internet and in other media worldwide, including the official Longines website, www.longines.com. The Longines Mark qualifies as a famous mark as that term is used in 15 U.S.C. §1125(c)(1).

49.     Longines has extensively used, advertised and promoted the Longines Mark in the United States in connection with the sale of high quality watches and related goods. As a result, the Longines Mark is among the most widely recognized trademarks in the United States, and the trademark has achieved secondary meaning as an identifier of high quality goods.

50.     Longines has carefully monitored and policed the use of the Longines Mark and has never assigned or licensed the Longines Mark to any of the Defendants in this matter.

51.     Genuine goods bearing the Longines Mark are widely legitimately advertised and promoted by Longines and related companies, authorized distributors, and unrelated third parties via the Internet.  Over the course of the past ten years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to Longines' overall marketing and consumer education efforts. Thus, Longines and related companies expend significant monetary resources on Internet marketing and consumer education, including SEO strategies. Those strategies allow Longines and its authorized retailers to fairly and legitimately educate consumers about the value associated with the Longines Mark and the goods sold thereunder.

**Omega's Trademark Rights**

52.     Omega is the owner of all rights in and to the trademark identified on Schedule "G" hereto (the "Omega Mark"), which is valid and registered on the Principal Register of the United States Patent and Trademark Office. The Omega Mark is used in conjunction with the manufacture and distribution of, among other things, high quality watches. A true and correct copy of the Certificate of Registration for the Omega Mark is attached hereto as Exhibit "6."

53.     The Omega Mark has been used in interstate commerce to identify and distinguish Omega's high quality watches and related goods for an extended period of time and serves as a symbol of Omega's quality, reputation and goodwill.

54.     Further, Omega has expended substantial time, money and other resources developing, advertising and otherwise promoting the Omega Mark.  Omega and related companies have spent millions of dollars to extensively advertise and promote products under the Omega Mark in magazines, newspapers, on the Internet and in other media worldwide, including the official Omega website, www.omegawatches.com. The Omega Mark qualifies as a famous mark as that term is used in 15 U.S.C. §1125(c)(1).

55.     Omega has extensively used, advertised and promoted the Omega Mark in the United States in connection with the sale of high quality watches and related goods. As a result, the Omega Mark is among the most widely recognized trademarks in the United States, and the trademark has achieved secondary meaning as an identifier of high quality goods.

56.     Omega has carefully monitored and policed the use of the Omega Mark and has never assigned or licensed the Omega Mark to any of the Defendants in this matter.

57.     Genuine goods bearing the Omega Mark are widely legitimately advertised and promoted by Omega and related companies, authorized distributors, and unrelated third parties via the Internet.  Over the course of the past ten years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to Omega's overall marketing and consumer education efforts. Thus, Omega and related companies expend significant monetary resources on Internet marketing and consumer education, including SEO strategies. Those strategies allow Omega and its authorized retailers to fairly and

legitimately educate consumers about the value associated with the Omega Mark and the goods sold thereunder.

### Rado's Trademark Rights

58.     Rado is the owner of all rights in and to the trademark identified on Schedule "H" hereto (the "Rado Mark"), which is valid and registered on the Principal Register of the United States Patent and Trademark Office. The Rado Mark is used in conjunction with the manufacture and distribution of, among other things, high quality watches. A true and correct copy of the Certificate of Registration for the Rado Mark is attached hereto as Exhibit "7."

59.     The Rado Mark has been used in interstate commerce to identify and distinguish Rado's high quality goods for an extended period of time and serves as a symbol of Rado's quality, reputation and goodwill.

60.     Further, Rado has expended substantial time, money and other resources developing, advertising and otherwise promoting the Rado Mark.  Rado and related companies have spent millions of dollars to extensively advertise and promote products under the Rado Mark in magazines, newspapers, on the Internet and in other media worldwide, including the official Rado website, www.rado.com. The Rado Mark qualifies as a famous mark as that term is used in 15 U.S.C. §1125(c)(1).

61.     Rado has extensively used, advertised and promoted the Rado Mark in the United States in connection with the sale of high quality watches and related goods. As a result, the Rado Mark is among the most widely recognized trademarks in the United States, and the trademark has achieved secondary meaning as an identifier of high quality goods.

62.     Rado has carefully monitored and policed the use of the Rado Mark and has never assigned or licensed the Rado Mark to any of the Defendants in this matter.

63.     Genuine goods bearing the Rado Mark are widely legitimately advertised and promoted by Rado and related companies, authorized distributors, and unrelated third parties via the Internet.  Over the course of the past ten years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing has become increasingly important to Rado's overall marketing and consumer education efforts. Thus, Rado and related companies expend significant monetary resources on Internet marketing and consumer education, including SEO strategies. Those strategies allow Rado and its authorized retailers to fairly and legitimately educate consumers about the value associated with the Rado Mark and the goods sold thereunder.

**Turlen's Trademark Rights**

64.     Turlen is the owner of all rights in and to the trademark identified on Schedule "I" hereto (the "Richard Mille Mark"), which is valid and registered on the Principal Register of the United States Patent and Trademark Office. The Richard Mille Mark is used in conjunction with the manufacture and distribution of, among other things, high quality watches. A true and correct copy of the Certificate of Registration for the Richard Mille Mark is attached hereto as Exhibit "8."

65.     The Richard Mille Mark has been used in interstate commerce to identify and distinguish Turlen's high quality goods for an extended period of time and serves as a symbol of Turlen's quality, reputation and goodwill.

66.     Further, Turlen and related companies expended substantial time, money and other resources developing, advertising and otherwise promoting the Richard Mille Mark. Turlen and related companies have spent millions of dollars to extensively advertise and promote products under the Richard Mille Mark in magazines, newspapers, on the Internet and in other

16

media worldwide, including the official Richard Mille website, www.richardmille.com. The

Richard Mille Mark qualifies as a famous mark as that term is used in 15 U.S.C. §1125(c)(1).

67.     Turlen and related companies have extensively used, advertised and promoted the

Richard Mille Mark in the United States in connection with the sale of high quality watches and

related goods. As a result, the Richard Mille Mark is among the most widely recognized

trademarks in the United States, and the trademark has achieved secondary meaning as an

identifier of high quality goods.

68.     Turlen has carefully monitored and policed the use of the Richard Mille Mark and

has never assigned or licensed the Richard Mille Mark to any of the Defendants in this matter.

69.     Genuine goods bearing the Richard Mille Mark are widely legitimately advertised

and promoted by Turlen and related companies, authorized distributors, and unrelated third

parties via the Internet.  Over the course of the past ten years, visibility on the Internet,

particularly via Internet search engines such as Google, Yahoo!, and Bing has become

increasingly important to Turlen's overall marketing and consumer education efforts. Thus,

Turlen and related companies expend significant monetary resources on Internet marketing and

consumer education, including SEO strategies. Those strategies allow Turlen and its authorized

retailers to fairly and legitimately educate consumers about the value associated with the Richard

Mille Mark and the goods sold thereunder.

**Defendants' Infringing Activities**

70.     Upon information and belief, Defendants are promoting and advertising,

distributing, selling and/or offering for sale at least watches in interstate commerce bearing

counterfeit and infringing trademarks that are exact copies of the Audemars Piguet Mark, Chanel

Marks, Gucci Marks, Hublot Mark, Longines Mark, Omega Mark, Rado Mark, and/or Richard

17

Mille Mark (the "Counterfeit Goods") via the Internet website and e-commerce stores on Internet marketplace websites using at least the Subject Domain Name and Seller IDs. Specifically, upon information and belief, Defendants are using identical copies of the Audemars Piguet Mark, Chanel Marks, Gucci Marks, Hublot Mark, Longines Mark, Omega Mark, Rado Mark, and/or Richard Mille Mark (collectively, "Plaintiffs' Marks") for different quality goods. Plaintiffs have used their respective Marks extensively and continuously before Defendants began offering counterfeit and confusingly similar imitations of Plaintiffs' goods.

71.     Upon information and belief, Defendants' Counterfeit Goods are of a quality substantially different than that of Plaintiffs' respective, genuine goods. Defendants, upon information and belief, are actively using, promoting and otherwise advertising, distributing, selling and/or offering for sale substantial quantities of their Counterfeit Goods with the knowledge and intent that such goods will be mistaken for Plaintiffs' genuine high quality goods despite Defendants' knowledge that they are without authority to use Plaintiffs' Marks. The net effect of Defendants' actions will cause confusion of consumers who will believe Defendants' Counterfeit Goods are genuine goods originating from, associated with, and approved by Plaintiffs.

72.     Defendants advertise their Counterfeit Goods for sale to the consuming public via an Internet website and e-commerce stores on Internet marketplace websites using at least the Subject Domain Name and Seller IDs. In so advertising these goods, Defendants improperly and unlawfully use Plaintiffs' Marks without Plaintiffs' permission. The misappropriation of Plaintiffs' advertising ideas in the form of Plaintiffs' Marks is the proximate cause of damage to Plaintiffs.

73.     As part of their overall counterfeiting and infringement scheme, Defendants are, upon information and belief, all employing and benefiting from substantially similar, paid advertising and marketing strategies based, in large measure, upon an illegal use of counterfeits and infringements of at least one of Plaintiffs' Marks. Specifically, Defendants are using counterfeits and infringements of at least one of Plaintiffs' Marks in order to make their e-commerce stores selling illegal goods appear more relevant and attractive to consumers online. By their actions, Defendants have created an illegal marketplace operating in parallel to the legitimate marketplace for Plaintiffs' respective genuine goods. Defendants are causing concurrent and indivisible harm to Plaintiffs and the consuming public by (i) depriving Plaintiffs of their right to fairly compete for space within search engine results and reducing the visibility of Plaintiffs' respective genuine goods on the World Wide Web, (ii) causing an overall degradation of the value of the goodwill associated with Plaintiffs' Marks, and (iii) increasing Plaintiffs' overall cost to market their goods and educate consumers about their brands via the Internet.

74.     Upon information and belief, Defendants are concurrently targeting their counterfeiting and infringing activities toward consumers and causing harm within this district and elsewhere throughout the United States.  As a result, Defendants are defrauding Plaintiffs and the consuming public for Defendants' own benefit.

75.     Upon information and belief, at all times relevant hereto, Defendants in this action had full knowledge of Plaintiffs' respective ownership of Plaintiffs' Marks, including their respective, exclusive rights to use and license such intellectual property and the goodwill associated therewith.

76. Defendants' use of Plaintiffs' Marks, including the promotion and advertisement, reproduction, distribution, sale and offering for sale of their Counterfeit Goods, is without Plaintiffs' consent or authorization.

77. Defendants are engaging in the above-described illegal counterfeiting and infringing activities knowingly and intentionally or with reckless disregard or willful blindness to Plaintiffs' rights for the purpose of trading on Plaintiffs' respective goodwill and reputations. If Defendants' intentional counterfeiting and infringing activities are not preliminarily and permanently enjoined by this Court, Plaintiffs and the consuming public will continue to be harmed.

78. Defendants' above identified infringing activities are likely to cause confusion, deception and mistake in the minds of consumers, the public, and the trade before, during, and after the time of purchase. Moreover, Defendants' wrongful conduct is likely to create a false impression and deceive customers, the public, and the trade into believing there is a connection or association between Plaintiffs' respective genuine goods and Defendants' Counterfeit Goods, which there is not.

79. Further, upon information and belief, Defendants are likely to transfer or secret their assets to avoid payment of any monetary judgment awarded to Plaintiffs.

80. Plaintiffs have no adequate remedy at law.

81. Plaintiffs are suffering irreparable and indivisible injury and have suffered substantial damages as a result of Defendants' unauthorized and wrongful use of Plaintiffs' Marks. If Defendants' counterfeiting and infringing and unfairly competitive activities are not preliminarily and permanently enjoined by this Court, Plaintiffs and the consuming public will continue to be harmed.

82.    The harm and damages sustained by Plaintiffs have been directly and proximately caused by Defendants' wrongful reproduction, use, advertisement, promotion, offers to sell, and sale of their Counterfeit Goods.

## COUNT I - TRADEMARK COUNTERFEITING AND INFRINGEMENT PURSUANT TO § 32 OF THE LANHAM ACT (15 U.S.C. § 1114)

83.    Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 82 above.

84.    This is an action for trademark counterfeiting and infringement against Defendants based on their use of counterfeit and confusingly similar imitations of Plaintiffs' Marks in commerce in connection with the promotion, advertisement, distribution, offering for sale, and sale of the Counterfeit Goods.

85.    Defendants are promoting and otherwise advertising, selling, offering for sale, and distributing at least watches, using counterfeits and/or infringements of at least one of Plaintiffs' Marks. Defendants are continuously infringing and inducing others to infringe Plaintiffs' Marks by using one or more of them to advertise, promote, offer to sell, and sell counterfeit and infringing watches.

86.    Defendants' concurrent counterfeiting and infringing activities are likely to cause and actually are causing confusion, mistake, and deception among members of the trade and the general consuming public as to the origin and quality of Defendants' Counterfeit Goods.

87.    Defendants' unlawful actions have individually and jointly caused and are continuing to cause unquantifiable damages to Plaintiffs and are unjustly enriching Defendants with profits at Plaintiffs' expense.

88.     Defendants' above-described illegal actions constitute counterfeiting and infringement of Plaintiffs' Marks in violation of Plaintiffs' respective rights under § 32 of the Lanham Act, 15 U.S.C. § 1114.

89.     Plaintiffs have each suffered and will continue to suffer irreparable injury and damages due to Defendants' above described activities if Defendants are not preliminarily and permanently enjoined. Additionally, Defendants will continue to wrongfully profit from their illegal activities.

## COUNT II - FALSE DESIGNATION OF ORIGIN
## PURSUANT TO § 43(a) OF THE LANHAM ACT (15 U.S.C. § 1125(a))

90.     Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 82 above.

91.     Defendants' Counterfeit Goods bearing, offered for sale, and sold using copies of at least one of Plaintiffs' Marks have been widely advertised and offered for sale throughout the United States via at least Internet marketplace websites.

92.     Defendants' Counterfeit Goods bearing, offered for sale and sold using copies of at least one of Plaintiffs' Marks are virtually identical in appearance to Plaintiffs' respective, genuine goods.  However, Defendants' Counterfeit Goods are different and likely inferior in quality. Accordingly, Defendants' activities are likely to cause confusion in the trade and among the general public as to at least the origin or sponsorship of their Counterfeit Goods.

93.     Defendants, upon information and belief, have used in connection with their advertisement, offer for sale, and sale of the Counterfeit Goods, false designations of origin and false descriptions and representations, including words or other symbols and trade dress which tend to falsely describe or represent such goods and have caused such goods to enter into

commerce with full knowledge of the falsity of such designations of origin and such descriptions and representations, all to Plaintiffs' detriment.

94.     Defendants have authorized infringing uses of at least one of Plaintiffs' Marks in Defendants' advertisement and promotion of their counterfeit and infringing branded goods. Defendants have misrepresented to members of the consuming public that the Counterfeit Goods being advertised and sold by them are genuine, non-infringing goods.

95.     Additionally, Defendants are using counterfeits and infringements of at least one of Plaintiffs' Marks in order to unfairly compete with Plaintiffs and others for space within search engine organic results, thereby jointly depriving Plaintiffs of a valuable marketing and educational tool which would otherwise be available to Plaintiffs and reducing the visibility of Plaintiffs' genuine goods on the World Wide Web.

96.     Defendants' above-described actions are in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

97.     Plaintiffs have each sustained indivisible injury and damage caused by Defendants' concurrent conduct. Absent an entry of an injunction by this Court, Defendants will continue to wrongfully reap profits and each Plaintiff will continue to suffer irreparable injury to its goodwill and business reputations, as well as monetary damages.

## COUNT III - COMMON LAW UNFAIR COMPETITION

98.     Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 82 above.

99.     This is an action against Defendants based on their promotion, advertisement, distribution, sale, and/or offering for sale of goods bearing marks that are virtually identical, both

visually and phonetically, to Plaintiffs' Marks in violation of Florida's common law of unfair competition.

100.     Specifically, Defendants are promoting and otherwise advertising, selling, offering for sale, and distributing watches and related goods bearing counterfeits and infringements of at least one of Plaintiffs' Marks. Defendants are also using counterfeits and infringements of one or more of Plaintiffs' Marks to unfairly compete with Plaintiffs and others for (1) space in search engine results across an array of search terms and (2) visibility on the World Wide Web.

101.     Defendants' infringing activities are likely to cause and actually are causing confusion, mistake, and deception among members of the trade and the general consuming public as to the origin and quality of Defendants' products by their use of Plaintiffs' Marks.

102.     Plaintiffs have no adequate remedy at law and are suffering irreparable injury as a result of Defendants' actions.

## COUNT IV - COMMON LAW TRADEMARK INFRINGEMENT

103.     Plaintiffs hereby adopt and re-allege the allegations set forth in Paragraphs 1 through 82 above.

104.     This is an action for common law trademark infringement against Defendants based on their promotion, advertisement, offering for sale, and sale of their Counterfeit Goods bearing Plaintiffs' Marks.  Plaintiffs are the owners of all common law rights in and to Plaintiffs' Marks.

105.     Specifically, Defendants, upon information and belief, are promoting and otherwise advertising, distributing, offering for sale, and selling goods bearing infringements of at least one of Plaintiffs' Marks.

24

106.     Defendants' infringing activities are likely to cause and actually are causing confusion, mistake and deception among members of the trade and the general consuming public as to the origin and quality of Defendants' Counterfeit Goods bearing Plaintiffs' Marks.

107.     Plaintiffs have no adequate remedy at law and are suffering damages and irreparable injury as a result of Defendants' actions.

### PRAYER FOR RELIEF

108.     WHEREFORE, Plaintiffs demand judgment on all Counts of this Complaint and an award of equitable relief and monetary relief, jointly and severally, against Defendants as follows:

a.     Entry of temporary, preliminary and permanent injunctions pursuant to 15 U.S.C. § 1116 and Federal Rule of Civil Procedure 65 enjoining Defendants, their agents, representatives, servants, employees, and all those acting in concert or participation therewith, from manufacturing or causing to be manufactured, importing, advertising or promoting, distributing, selling or offering to sell their Counterfeit Goods; from infringing, counterfeiting, or diluting Plaintiffs' Marks; from using Plaintiffs' Marks, or any mark or trade dress similar thereto, in connection with the sale of any unauthorized goods; from using any logo, trade name or trademark or trade dress that may be calculated to falsely advertise the services or goods of Defendants as being sponsored by, authorized by, endorsed by, or in any way associated with Plaintiffs; from falsely representing themselves as being connected with Plaintiffs, through sponsorship or association, or engaging in any act that is likely to falsely cause members of the trade and/or of the purchasing public to believe any goods or services of Defendants are in any way endorsed by, approved by, and/or associated with Plaintiffs; from using any reproduction, counterfeit, infringement, copy, or colorable imitation of Plaintiffs' Marks in connection with the

publicity, promotion, sale, or advertising of any goods sold by Defendants, including, without

limitation, watches; from affixing, applying, annexing or using in connection with the sale of any

goods, a false description or representation, including words or other symbols tending to falsely

describe or represent Defendants' goods as being those of Plaintiffs, or in any way endorsed by

Plaintiffs and from offering such goods in commerce; from engaging in search engine

optimization strategies using colorable imitations of Plaintiffs' respective names or trademarks;

and from otherwise unfairly competing with Plaintiffs.

   b. Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act, that,

upon Plaintiffs' request, the top level domain (TLD) Registry for the Subject Domain Name or

its administrators, including backend registry operators or administrators, place the Subject

Domain Name on Registry Hold status for the remainder of the registration period for any such

domain name, thus removing them from the TLD zone files which link the Subject Domain

Name to the IP addresses where the associated websites are hosted.

   c. Entry of an order pursuant to 28 U.S.C. § 1651(a), The All Writs Act,

canceling for the life of the current registration or, at Plaintiffs' election, transferring the Subject

Domain Name and any other domain names used by Defendants to engage in their counterfeiting

and infringement of Plaintiffs' Marks at issue to Plaintiffs' control so they may no longer be used

for illegal purposes, and requiring the Seller IDs, and any other alias seller identification names,

store numbers, or store urls being used or controlled by Defendants to engage in the business of

marketing, offering to sell or selling goods bearing counterfeits and infringements of Plaintiffs'

Marks be disabled by the applicable governing Internet marketplace website.

   d. Entry of an order that, upon Plaintiffs' request, any Internet marketplace

website operators and/or administrators that are provided with notice of the injunction, including

but not limited to Alibaba.com Hong Kong Limited, which operates the AliExpress.com platform, eBay, Inc., iOffer. Inc., ContextLogic, Inc., which operates the Wish.com platform, identify any e-mail address known to be associated with Defendants' respective Seller ID, and cease facilitating access to any or all e-commerce stores through which Defendants engage in the promotion, offering for sale, and/or sale of goods bearing counterfeits and/or infringements of Plaintiffs' Marks.

       e.     Entry of an order requiring Defendants to account to and pay Plaintiffs for all profits and damages resulting from Defendants' trademark counterfeiting and infringing and unfairly competitive activities and that the award to Plaintiffs be trebled, as provided for under 15 U.S.C. §1117, or, at Plaintiffs' election with respect to Count I, that Plaintiffs be awarded statutory damages from each Defendant in the amount of two million dollars ($2,000,000.00) per each counterfeit trademark used and product sold, as provided by 15 U.S.C. §1117(c)(2) of the Lanham Act.

       f.     Entry of an award pursuant to 15 U.S.C. § 1117 (a) and (b) of Plaintiffs' costs and reasonable attorneys' fees and investigative fees associated with bringing this action.

       g.     Entry of an order that, upon Plaintiffs' request, any financial institutions, payment processors, banks, escrow services, money transmitters, or marketplace platforms, including but not limited to, Alibaba.com Hong Kong Limited, Zhejiang Ant Small and Micro Financial Services Group Co., Ltd., AliPay (China) Internet Technology Co. Ltd., and Alipay.com Co., Ltd., iOffer. Inc., PayPal, Inc., Payoneer Inc., ContextLogic, Inc., Wish.com, and their related companies and affiliates, identify and restrain all funds, up to and including the total amount of judgment, in all financial accounts and/or sub-accounts used in connection with the Subject Domain Name and Seller IDs, or other domain names, alias seller identification or e-

commerce store names, store numbers, or store urls used by Defendants presently or in the

future, as well as any other related accounts of the same customer(s) and any other accounts

which transfer funds into the same financial institution account(s), to be surrendered to Plaintiffs

in partial satisfaction of the monetary judgment entered herein.

        h.     Entry of an award of pre-judgment interest on the judgment amount.

        i.      Entry of an order for any further relief as the Court may deem just and

proper.

DATED: March 13, 2017.        Respectfully submitted,

        STEPHEN M. GAFFIGAN, P.A.

        By: **s:/Stephen M. Gaffigan/**_____
        Stephen M. Gaffigan (Fla. Bar No. 025844)
        Virgilio Gigante (Fla. Bar No. 082635)
        T. Raquel Rodriguez-Albizu (Fla. Bar. No. 103372)
        401 East Las Olas Blvd., #130-453
        Ft. Lauderdale, Florida 33301
        Telephone: (954) 767-4819
        Facsimile: (954) 767-4821
        E-mail: stephen@smgpa.net
        E-mail: leo@smgpa.net
        E-mail: raquel@smgpa.net

        Attorneys for Plaintiffs

**SCHEDULE "A"**
**DEFENDANTS BY NUMBER AND SUBJECT DOMAIN NAME / SELLER ID AND**
**STORE URL / STORE NUMBER**

| Defendant Number | Defendant / Domain Name / Seller ID | Store URL / Store Number |
|---|---|---|
| 1 | kkkwatch.com | |
| 1 | linyu5329-6 | http://www.ebay.com/usr/linyu5329-6 |
| 2 | awwo6211 | http://www.ebay.com/usr/awwo6211 |
| 3 | abloom | https://www.wish.com/merchant/abloom |
| 4 | AYO BOX | https://www.wish.com/merchant/dollarmall |
| 5 | baby1230 | https://www.wish.com/merchant/shenzhenyuehaijindu ntechnologydevelopmentcoltd |
| 6 | bidding | https://www.wish.com/merchant/hongkonghaibifuinte rnationallimited |
| 7 | Black Friday Foreign Trade Co., Ltd. | https://www.wish.com/merchant/blackfridayforeigntra decoltd |
| 8 | Bye Bye Baby | https://www.wish.com/merchant/byebyebaby |
| 9 | caiminyinlc | https://www.wish.com/merchant/caiminyinlc |
| 10 | clotinc | https://www.wish.com/merchant/clotinc |
| 11 | cloud5168 | https://www.wish.com/merchant/cloud5168 |
| 12 | CNBLUE | https://www.wish.com/merchant/shinesongonlinecoltd |
| 13 | colwatch | https://www.wish.com/merchant/colwatch |
| 14 | DressLoves | https://www.wish.com/merchant/dressloves |
| 15 | dxy | https://www.wish.com/merchant/dxy |
| 16 | erbifashion | https://www.wish.com/merchant/erbifashion |
| 17 | fashion shoes for you | https://www.wish.com/merchant/fashionshoesforyou |
| 18 | FashionLove | https://www.wish.com/merchant/fashionlove |
| 19 | fashionshop after 90's | https://www.wish.com/merchant/fashionshopafter90s |
| 20 | feifei123 | https://www.wish.com/merchant/feifei123 |
| 21 | Full House of mine | https://www.wish.com/merchant/fullhouseofmine |
| 22 | fuzhousugewenhuachuanmeiyouxiangongsi | https://www.wish.com/merchant/福州�putton格文化传媒有限公司 |
| 23 | gardener | https://www.wish.com/merchant/广州佳和国际贸易 |
| 24 | Get Rich | https://www.wish.com/merchant/getrich |
| 25 | guanggaoshanzonghui | https://www.wish.com/merchant/guanggaoshanzongh ui |
| 26 | Guangzhou Queen Love Hair Products Co.,Ltd | https://www.wish.com/merchant/guangzhouqueenlove hairproductscoltd |
| 27 | HESHE | https://www.wish.com/merchant/heshe |
| 28 | Jewelry Shopping Mall | https://www.wish.com/merchant/jewelryshoppingmall |
| 29 | jiexiang | https://www.wish.com/merchant/jiexiang |

| 30 | Jump Man | https://www.wish.com/merchant/jumpman |
| 31 | Kevin Gong | https://www.wish.com/merchant/kevingong |
| 32 | Kewl Zone | https://www.wish.com/merchant/brokegirlsstore |
| 33 | LADY ZONE | https://www.wish.com/merchant/ladyzone |
| 34 | laowangzahuopu | https://www.wish.com/merchant/老王杂货铺 |
| 35 | Learn to choose | https://www.wish.com/merchant/learntochoose |
| 36 | liuxiaoxiao | https://www.wish.com/merchant/liuxiaoxiao |
| 37 | MEN AND GIRLS | https://www.wish.com/merchant/menandgirls |
| 38 | mini fashion for you | https://www.wish.com/merchant/minifashionforyou |
| 39 | Mofree | https://www.wish.com/merchant/mofree |
| 40 | Mohammed | https://www.wish.com/merchant/mohammed |
| 41 | Mrs. Cherry | https://www.wish.com/merchant/mrscherry |
| 42 | nuoerxuntongxunyouxiangongsi | https://www.wish.com/merchant/诺尔讯通讯有限公司 |
| 43 | OXEY | https://www.wish.com/merchant/OXEY |
| 44 | pmjlc | https://www.wish.com/merchant/pmjlc |
| 45 | Polo outlet stores | https://www.wish.com/merchant/europeanfashion |
| 46 | ranlocoil | https://www.wish.com/merchant/ranlocoil |
| 47 | Sakura Blossom | https://www.wish.com/merchant/sakurablossom |
| 48 | seaamoy | https://www.wish.com/merchant/seaamoy |
| 49 | Shoes&Bags Co.,Ltd. | https://www.wish.com/merchant/shoesbagscoltd |
| 50 | Shopping For Funning | https://www.wish.com/merchant/shoppingforfunning6bae50989e4011e59f7d06e52dcc367f |
| 51 | Showdown | https://www.wish.com/merchant/showdown |
| 52 | Shuo promise genuine shop | https://www.wish.com/merchant/shuopromisegenuineshop |
| 53 | Sister elf | https://www.wish.com/merchant/sisterelf |
| 54 | skygreen | https://www.wish.com/merchant/skygreen |
| 55 | substantial shop | https://www.wish.com/merchant/substantialshop |
| 56 | sunny Outdoor factory | https://www.wish.com/merchant/sunnyoutdoorfactory |
| 57 | The big time onlin store | https://www.wish.com/merchant/thebigtimeonlinstore |
| 58 | The luck for you | https://www.wish.com/merchant/theluckforyou |
| 59 | Time Flies Store | https://www.wish.com/merchant/timefliesstore |
| 60 | tonn | https://www.wish.com/merchant/tonn |
| 61 | Top fashion sneakers | https://www.wish.com/merchant/topfashionsneakers |
| 62 | xp style | https://www.wish.com/merchant/xpstyle |
| 63 | xwqlc | https://www.wish.com/merchant/xwqlc |
| 64 | YPSTORE | https://www.wish.com/merchant/ypstore |
| 65 | z63026302 | https://www.wish.com/merchant/z63026302 |
| 66 | zengkuixuan | https://www.wish.com/merchant/zengkuixuan |
| 67 | zyshop | https://www.wish.com/merchant/zyshop |

| 68 | buymore1688 | https://www.ioffer.com/selling/buymore1688 |
| 69 | dalong69 | https://www.ioffer.com/selling/dalong69 |
| 70 | ebksz6219 | https://www.ioffer.com/selling/ebksz6219 |
| 71 | fafafa8886 | https://www.ioffer.com/selling/fafafa8886 |
| 72 | gogogoogooo | https://www.ioffer.com/selling/gogogoogooo |
| 73 | kaishui2015 | https://www.ioffer.com/selling/kaishui2015 |
| 74 | key2016 | https://www.ioffer.com/selling/key2016 |
| 75 | maggielee88 | https://www.ioffer.com/selling/maggielee88 |
| 76 | nasaclud2016 | https://www.ioffer.com/selling/nasaclud2016 |
| 77 | qaobeio365 | https://www.ioffer.com/selling/qaobeio365 |
| 78 | renyixuan188 | https://www.ioffer.com/selling/renyixuan188 |
| 79 | taihuu188 | https://www.ioffer.com/selling/taihuu188 |
| 80 | timepiece1984 | https://www.ioffer.com/selling/timepiece1984 |
| 81 | wwcc | https://www.ioffer.com/selling/wwcc |
| 82 | High quality watches Store | Store No. 2824045 |
| 83 | KAIKAI05 Store | Store No. 2837025 |
| 84 | kaiKai4 Store | Store No. 2828103 |
| 85 | Locales tyrants watchess Store | Store No. 2802216 |
| 86 | Shop2824043 Store | Store No. 2824043 |

**SCHEDULE "B"**
**PLAINTIFF AUDEMARS PIGUET'S FEDERALLY REGISTERED TRADEMARK**

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| AUDEMARS PIGUET | 1,591,934 | April 17, 1990 | IC 014 - watches, clocks, stop watches, time recorders, chronometers, chronographs, watch movements, and parts of all the foregoing. |

**SCHEDULE "C"**
**PLAINTIFF CHANEL'S FEDERALLY REGISTERED TRADEMARKS**

| Trademark | Registration Number | Registration Date | Class / Goods |
|-----------|---------------------|-------------------|---------------|
| CHANEL | 0,955,074 | March 13, 1973 | IC 014 – Watches |
| J12 | 2,559,772 | April 9, 2002 | IC 009 - Timepieces; namely, watches, and parts thereof |

**SCHEDULE "D"**
**PLAINTIFF GUCCI'S FEDERALLY REGISTERED TRADEMARKS**

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| GUCCI | 0,959,338 | May 22, 1973 | IC 014 – watches. |
|  | 3,470,140 | July 22, 2008 | IC 006 - metal key rings.<br><br>IC 014 - Jewelry, namely, earrings, pendants, rings, necklaces and watches; key rings of precious metal.<br><br>IC 025 - Apparel, namely, neckties, scarves, shirts, sweaters, coats, hats, socks, dresses, bathing suits, and gloves |

**SCHEDULE "E"**
**PLAINTIFF HUBLOT'S FEDERALLY REGISTERED TRADEMARK**

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
|  | 1,222,529 | January 4, 1983 | IC 014. Watches and Clocks and Parts Therefor; Chronometers; Chronographs; Costume Jewelry and Jewelry Made Wholly or in Part of Precious Metals |

**SCHEDULE "F"**
**PLAINTIFF LONGINES' FEDERALLY REGISTERED TRADEMARK**

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| LONGINES | 1,377,147 | January 7, 1986 | IC 014 - watches and parts therefor, and jewelry and costume jewelry. |

**SCHEDULE "G"**
**PLAINTIFF OMEGA'S FEDERALLY REGISTERED TRADEMARK**

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| **OMEGA** | 566,370 | November 4, 1952 | IC 014 - watches and parts thereof. |

**SCHEDULE "H"**
**PLAINTIFF RADO'S FEDERALLY REGISTERED TRADEMARK**

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| RADO | 1,729,207 | November 3, 1992 | IC 014 - watches and parts thereof |

**SCHEDULE "I"**
**PLAINTIFF TURLEN'S FEDERALLY REGISTERED TRADEMARK**

| Trademark | Registration Number | Registration Date | Class / Goods |
|---|---|---|---|
| RICHARD MILLE | 3,117,381 | July 18, 2006 | IC 014. horological and chronometric instruments |